UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

KALVIN SCHANZ                                    No. 1:21-cv-1028


              Plaintiff,

Vs

CITY OF OTSEGO, MICHIGAN, a municipal
corporation, MEMBERS OF THE CITY COMMISSION
of Otsego, individually and in their official capacity
BRANDON WEBER, individually and in his
official capacity, and, AARON MITCHELL,
 individually and in his official capacity, DAVE RAYMAN,
individually and in his official capacity, and
BRET REITKIRK, individually and in his official capacity.


              Defendants.
_____/

## VERIFIED COMPLAINT
## AND JURY DEMAND

Plaintiff Kalvin Schanz ("Schanz") brings this Verified Complaint against

Defendant City of Otsego, Michigan ("the City"), the City Commission, Brandon

Weber ("Weber"), Aaron Mitchell ("Mitchell"), Dave Rayman ("Rayman"), and

Bret ReitKirk ("ReitKirk") and states as follows:

INTRODUCTION

1.      Schanz files this action against Aaron Mitchell, Dave Rayman, and

the City for violation of 42 USC 3617 for coercing, intimidating, threatening and,

or interfering with Schanz in the exercise of the fair housing rights, granted and protected under 42 USC 3604, in reference to a building at 313 W. Allegan Street in Otsego, Michigan owned by Schanz.

2.     Schanz files this 42 U.S.C. § 1983 action against police officer Brandon Weber for violating Schanz's rights under the 4th and 14th Amendments to the United States Constitution through an illegal, warrantless and unreasonable search of Schanz's building at 313 W Allegan Street in Otsego, Michigan.

3.     Schanz files this 42 U.S.C. § 1983 action against Bret ReitKirk, the City Commission and the City for violating Schanz' procedural due process rights under the 5th and 14th Amendments to the United States Constitution failing to give Schanz proper notice and opportunity to be heard, after initiating condemnation proceedings to deprive Schanz of his property:  the building at 313 W. Allegan Street in Otsego, Michigan.

4.     Schanz also files this 42 U.S.C. § 1983 action against Mitchell, Rayman, and the City for taking Schanz's private property for public use, without just compensation in violation of the 5th and 14th Amendments to the United States Constitution.

5.     Schanz seeks declaratory relief, injunctive relief, monetary damages and other relief.

PARTIES, JURISDICTION AND VENUE

6.     Schanz is a resident of Otsego, Allegan County, Michigan and owns property in the City of Otsego at 313 W. Allegan Street in Otsego, Michigan.

7.     Otsego is a municipal corporation organized in and existing under the Constitution and laws of the State of Michigan.

8.     The members of the City Commission are the legislative branch of the City government.

9.     Defendant Aaron Mitchel was at all relevant times the city administrator of the City of Otsego, Michigan. He possessed the power and the authority and was charged by law with the responsibility to enact policies and to prescribe rules and practices concerning the operation of the City, its Police Department, its Building Department, and its office of Economic Development. Mitchell is sued individually and in his official capacity.

10.     Defendant Dave Rayman was at all relevant times the director of the office of Economic Development of the City of Otsego, Michigan.  He possessed the power and the authority and was charged by law with the responsibility to enact policies and to prescribe rules and practices concerning the operation of the City's office of Economic Development.  Rayman is sued individually and in his official capacity.

11.     Defendant Brandon Weber is an officer, sergeant or lieutenant of the

City's Police Department, who was at the time of committing the acts alleged, a duly authorized employee of Defendant City, who was acting within the course and scope of his respective duties and with the complete authority and ratification of Defendant City.

12. Bret ReitKirk was the City's Deputy Building Official at the time of committing the acts alleged. He was a duly authorized employee of Professional Code Inspections, Inc., the company with which the City contracts for its building inspections. ReitKirk was acting under color of law, within the course and scope of his respective duties and with the complete authority and ratification of Defendant City.

13. All of the acts complained of in this Complaint by Plaintiff against Defendants were done and performed by Defendants by and through their authorized agents, servants and/or employees, and each of them, all of whom at all relevant times were acting within the course, purpose and scope of that agency, service and/or employment capacity. Moreover, Defendants and their agents ratified all of the acts of which complaint is made.

14. At all relevant times, these Defendants, and each of them, were acting under color of law, that is, under the color of the statutes, ordinances, regulations, policies, customs and usages of Defendant City and State of Michigan. t all times

mentioned, each and every Defendant was the agent of each and every other Defendant and had the legal duty to oversee and supervise the hiring, conduct and employment of each and every Defendant named and unnamed in this Complaint.

15.    In doing the acts and failing and/or omitting to act as described below, Defendants, and each of them, were acting on the implied and/or with the actual permission and consent of Defendant City and were duly appointed agents, employees and/or representatives of Defendant City, acting in the course and scope of their employment and agency with Defendant City.

16.    Jurisdiction is proper under 28 U.S.C. §§1331and 1343, because federal questions are presented in this action under the United States Constitution, 42 USC 3617, and 42 U.S.C.§ 1983.

17.    Venue is proper under 28 U.S.C. §139l (b)(l) and (2) because this is the judicial district where the Defendants reside and where a substantial part of the events or omissions giving rise to the claims occurred or will occur.

## COMMON FACTUAL ALLEGATIONS

18.    Schanz re-alleges and incorporates by reference the allegations contained in the previous paragraphs as though fully set forth herein.

19.    On September 15, 2008, the Otsego Public School District sold by warranty deed to The Cardinal Newman Liberal Arts Project the former public

elementary school building at 313 W. Allegan Street in Otsego, Michigan ("the school.")  The building is more than 80 years old. It was originally Otsego High School and then was Allegan Street Elementary School before The Cardinal Newman Liberal Arts Project bought it.   It is distinctive for its architecture, high ceilings, original sky lights in the historic library.  Structurally, it is built entirely of building blocks which makes it fireproof.  To replace the building today would require expenditures of 10 to 20 million dollars.  See photographs, Ex. 1.

20.    The Cardinal Newman Liberal Arts Project operated a Catholic liberal arts college in the school.   There were dormitory rooms in part of the school.

21.    On May 14, 2013, The Cardinal Newman Liberal Arts Project sold to Schanz by warranty deed the same building at 313 W. Allegan Street in Otsego, Michigan.  At that time, the building was zoned residential.

22.    At time of the sale to Schanz, four college students were living in the building.  City officials fully approved of the occupancy of the building by the students.   After the purchase, Schanz occupied the building as his secondary residence until the Defendants illegally interfered with his occupancy.

23.    Before Schanz bought the school, JBS USA Food Company ("JBS") bought the meat packing plant in Plainwell, Michigan about 3.5 miles from the city limits of the City of Otsego.  JBS then employed many workers.  Some those workers

were natives of the Marshall Islands ("Pacific Islanders") and practiced the Islamic religion.

24.    Before Schanz bought the school, Schanz knew that JBS was employing the Pacific Islanders at the Plainwell plant.  In about 2015, Schanz learned that JBS was providing residential facilities for the Pacific Islanders in Grand Rapids, Michigan and JBS was transporting them between Grand Rapids and Plainwell each workday.  A gentleman approached Schanz about buying the school and converting it to residential facilities for 90 to 120 of the Pacific Islanders who would then be much closer to the JBS plant.  Schanz wanted to either convert the school and rent it to the Pacific Islanders or sell the school to the gentleman for that purpose.

25.    The gentleman and Schanz organized a meeting at the school attended by executives from JBS, Schanz, Schanz's partner Connie Struyk, and Defendants Mitchell and Rayman.   The JBS executives were very favorably impressed with the school and walked upstairs to view the second floor.  Schanz, Connie Struyk, and Mitchell and Rayman remained on the first floor.  Then, Mitchell and Rayman told Schanz: "Those people are not living here.  It's not happening.  The whole town would be pissed-off at you.  The town's people would run you and those people out of town."  When Mitchell and Rayman spoke of "those people," they were referring to the Muslim Pacific Islanders who were working at the JBS plant.

26.    According to the 2020 U.S. Census, the population of the City of Otsego, Michigan is 95.9% white.  The percentage of white residents of Otsego was virtually the same from the time of the JBS meeting at the school until the present.

27.    After hearing what Mitchell and Rayman said, Schanz felt coerced, intimidated, threatened.  The threatening and intimidating remarks of Mitchell and Rayman dissuaded Schanz from either converting the school and renting it to the Pacific Islanders or selling the school to the gentleman for that purpose.  He is afraid of being harmed or harassed by the town's people.

28.    After the meeting with the JBS executives, Schanz would see Rayman about once every other month and ask again about renting the school to the Pacific Islanders who, Schanz urged, "will not hurt anything."  Rayman would reply, "It ain't happening.  The town's people would hang you.  Imagine how pissed-off the community would be if you did that.  We would rather destroy the school than provide housing to those people."  The same interchange occurred bi-monthly through March 2021.

29.    After the meeting with the JBS executives, Schanz would see Mitchell about once every three months and ask again about renting the school to the Pacific Islanders who, Schanz urged, "will not hurt anything."  Mitchell would laugh and reply, "It ain't happening.  The town's people would run you out of town."  The same interchange occurred bi-monthly through March 2021.

30.    After hearing what Mitchell and Rayman said each subsequent time, Schanz felt coerced, intimidated, threatened.  The threatening and intimidating remarks of Mitchell and Rayman dissuaded Schanz from either converting the school and renting it to the Pacific Islanders or selling the school for that purpose.

31.    In about 2016 0r 2017, Mike Zeter (now City Councilman for the City of Allegan,) was negotiating with Schanz for purchasing the school to convert it to low-income housing.  Zeter wanted to obtain a grant from the Michigan Economic Development Association (now, the Michigan Economic Development Corporation) to partially fund the project.  The grant money would have been federal funds flowing through the City.  Approval from the City of Otsego was required for obtaining the grant money.  Therefore, Zeter met with Mitchell and Rayman to obtain the City's approval.

32.    When Zeter explained to Mitchell and Rayman that he wanted to convert the school to a low-income housing project, both Mitchell and Rayman were brutally clear in refusing to approve the grant money.  They both said, "Absolutely not.  We are not interested in having those kinds of people here."  The rejection by Mitchell and Rayman prevented Zeter from following through with a deal with Schanz.  If Mitchell and Rayman had approved the grant, Zeter would have bought the building and started construction four years ago.

33.    Later, in 2020 or 2021, Zeter met again with Mitchell about the

development of the school. This time Zeter just proposed putting shops on the ground floor and residences on the second floor. Zeter's concept was not low-income housing, and he did not mention "low-income housing" to Mitchell. Mitchell said that some repairs to the school were required but, if the repairs were made and approved by the City, Mitchell would approve the project.

34.   In about January 2020, the police chief Gordon Konkle asked Schanz to meet at City's police station. After Schanz arrived, Kirk Scharphorn Sr. arrived with Bret ReitKirk. Scharphorn was the director of inspections at Professional Code Inspections of Michigan, which performed building code inspections for the City. Scharphorn told Schanz that he was there to inspect the school. When Schanz expressed surprise (because he had no notice of the inspection), Scharphorn told the Konkle that the inspection was off, because it was illegal to enter the school without the owner's permission or a valid search warrant. But Schanz offered to show them the school. However, Schanz did not have a key with him, so the code inspector just looked in windows. No code violations were issued.

35.   In about May 2020, Schanz saw three teenagers in the school. Schanz went in the school and saw several broken windows. Schanz called the police. Officer Brandon Weber came and surveyed the damage, took photographs, and wrote a report. Schanz did not get a blight ticket for any conditions in the school.

36.   In July 2020, Schanz occasionally opened a few windows partway to

ventilate the school and alleviate the heat.

37.   In July 2020, on the pretext of windows being partway open and the pretext of looking for intruders, Brandon Weber illegally, in violation of the 4th and 14th Amendment, entered the school twice without the consent or knowledge of Schanz, without a search warrant, and without any circumstances excusing him from obtaining a search warrant.

38.   The second time that Weber entered the school he took photographs and wrote a police report which alleged various building code violations.  He forwarded the photographs and his report to Mitchell and to Bret Reitkirk of Professional Code Inspectors.  Ex. 2.

39.   Bret Reitkirk walked around the school and looked through the windows but did not enter the school.  Based upon the cursory inspection, he confirmed the conditions in Weber's report.

40.   In about June 2020, Schanz had a written contract with Wolverine Construction for the latter to build condominiums on the site of the school.  That deal did not materialize because Wolverine Construction believed the site was not suitable.  In about September 2020, after the deal with Wolverine Construction failed, Schanz told Dave Rayman, "I am going to put the Marshall Islanders in there.

41.   When the City designates a structure as a dangerous building and seek to demolish it, the proceedings for demolition must be compliant

with local law and procedure.  That procedure requires proper notice and a valid means of determining that the property in fact was a public nuisance.

42.    Under the City of Otsego City Code, Schanz was initially entitled to a hearing before a hearing board appointed by the city manager. The hearing board must hear evidence from all interested parties, including the property owner.  The board must make findings of fact and determine the condition of the building, the cost to repair, and issue a decision to either close the proceedings or order the building demolished or repaired.  City Code Sec. 10-161-163.  <u>It was the duty of the City to set up the hearing and give the property owner adequate notice of the hearing.  It was not the obligation of the owner to initiate an appeal of the City Building Official's decision to demolish the school.</u> [City Code sections regarding dangerous buildings attached, as Ex. 3.)

43.    On August 24, 2020, Defendant Bret ReitKirk, the City's Building Official, mailed to the home address of *Schanz's mother* a letter stating that the school was a nuisance and that Schanz had 120 days to demolish the school.  ReitKirk claimed the school was an "unsafe structure." But the letter contained no description of the defects or conditions upon which the building official's finding was based, as required by City Code Sec. 10-162(b)(2).  There was no notice of a date and time for a hearing

before the board appointed by the city manager, as required by City Code

Sec. 10-162(b)(3).  Instead, ReitKirk put the burden on Schanz to appeal

ReitKirk's determination for demolition to the Otsego City Construction

Board of Appeals.  Ex. 4.  ReitKirk entirely failed to comply with the City's

ordinances for administrative hearings for dangerous buildings which put the

burden on the City to set and give notice of administrative hearings during

which the property owner can present his evidence to contest the demolition.

44.     Under the City of Otsego City Code, the following notice

requirements apply for the initial hearing before the hearing board appointed

by the city manager:

> **Sec. 10-162. Notice to owner or lessee.**
>
> (a)     When the whole or any part of any building, dwelling or structure is found to be a dangerous building, the building official shall issue a notice of such finding, directed to the owner, agent or lessee registered with the building official. If no owner, agent or lessee has been registered, the notice shall be directed to each owner of or party in interest in the building in whose name the property appears on the last local tax assessment records.
>
> (b)     The notice provided for in this section shall be in writing and shall:
>
>> (1) Include a description of the real estate sufficient for identification. This may be a street number, permanent parcel number or other description.
>>
>> (2) Include a description of the defects, conditions or violations upon which the building official's finding is based.

(3)  Specify the time and place of a hearing on the condition of the building, dwelling or structure, at which time and place the person to whom the notice is directed shall have the opportunity to show cause why the building, dwelling or structure should not be ordered to be demolished or otherwise made safe.

(c)      <u>The notice provided for in this section shall be served upon the person to whom it is directed personally or, in lieu of personal service, may be mailed by certified mail, return receipt requested, addressed to such person at the address shown on the tax record, at least ten days before the date of the hearing described in the notice. If any person to whom a notice is directed is not personally served, in addition to mailing the notice, a copy thereof shall be posted upon a conspicuous part of the building, dwelling or structure.</u>

(d)      The building official shall file a copy of the notice provided for in this section with the hearing board.

(Otsego City Code 1977, § 7.3(b)) (emphasis added.)

City Code Sec. 10-162. Notice to owner or lessee.

45.    The notice provision clearly expresses a preference for personal service. It states the notice "*shall* be served upon the person to whom it is directed personally."  It allows for ("in lieu of personal service, *may* be mailed") a certified mailing to the owner's address on the tax record only if the address or other location of the owner is not known.  If the mailing option is allowed, the city must also post the notice on the property.

46.   Schanz's mother's house, where ReitKirk sent his letter, is  two houses down from Schanz's house.  But his mother spends the winters in Arizona and that is where she was when ReitKirk mailed his letter.  The post

office forwarded the notice to Schanz's mother in Arizona.  Thereafter,
Schanz's mother mailed the letter to Schanz in Otsego.  But by the time
Schanz received the letter, the time for requesting an appeal, as claimed in
ReitKirk's letter, had passed.  Therefore, even if ReitKirk had used the
proper hearing procedure, he did not give adequate notice to Schanz.

47.    Bret ReitKirk, Brandon Weber, and most residents of Otsego
know where Schanz lives.  Schanz has been a resident of the City for his
entire life.  He grew up in his parents' house at 2222 Jefferson Rd. in
Otsego.  As an adult, he moved two doors down from his parents' house and
has lived there, at 2190 Jefferson Rd., ever since.  He lives in Judge Harry
Beach's former house and everyone in town knows that.  Schanz went to
school with Shane Weber, Brandon Weber's brother.

48.    Also, under the City Code10-162(c), when the City seeks demolition
of a dangerous building and the owner's address is unknown, the City must also
serve the notice of hearing by *posting* on the subject property in addition to service
by certified mail. But the City did not post the notice of hearing on the school.

49.    The City never held the hearing required by City Code 10-162(b)(3).

50.     If the City did hold the above hearing, the "Dangerous
Building" section of the code further states:

(B) If it is determined by the board that the building, dwelling or

structure is unfit for human habitation or is a dangerous building and should be demolished or otherwise made safe, it shall so order, fixing a time in the order for the owner to comply therewith.

(C) A copy of the findings and order of the hearing board shall be served on the owner, agent or lessee in the manner prescribed in section 10-162.

City Code Sec. 10-163.  Therefore, the findings and order of the hearing board must be served in the same manner as the notice of hearing before that board.  But the City never served any findings and order of the hearing board upon Schanz by any means.

51.     After the hearing board issues its findings and order, if the owner of the property refuses to comply with the order, or if the owner did not appear at the hearing before the board, the City Commission must review the findings and order of the board and set a hearing.  "At the hearing, the owner, agent or lessee shall be given the opportunity to show cause why the dangerous building should not be demolished or otherwise made safe and the city commission shall either approve, disapprove or modify the order of the board." City Code Sec. 10-164.

52.     The City Commission never held the hearing required by City Code Sec. 10-164.

53.     The City Commission must give notice of its hearing to the owner in the same manner as prescribed for the notice of the board hearing and of the findings/order of the board.  Sec. 10-164.  But, if the City Commission held the

hearing, the City Commission never served a notice of the City Commission hearing upon Schanz by any means.  Therefore, if the hearing occurred, Schanz did not know of the hearing, did not attend it, and lost the opportunity to challenge the board's prior findings and determination.

54.     "An owner aggrieved by any final decision or order of the city commission under section 10-164 may appeal the decision or order to the circuit court by filing a petition for an order of superintending control within 21 days from the date of the decision."  (Code 1977, § 7.3(e))."  City Code Sec. 10-165. Appeals. If the City Commission never held the hearing, there was nothing from which Schanz to appeal.

55.     Nonetheless, in *City of Otsego v Kalvin Schanz*, case No. 211139 ON in the 57th District Court of the State of Michigan, Schanz timely requested a hearing for review.  Letter, 4/12/21, Ex. 5.  A formal hearing (trial) in that case is set for **December 9, 2021, at 1:00 p.m**.  Notice of Hearing, Ex. 6.

56.     But a review by superintending control will not provide an adequate state remedy for Schanz, because of the limited scope of review of the state district court.

A. In exercising superintending control over an inferior tribunal,

the standard for issuing superintending control is to determine whether

the inferior tribunal failed to perform a clear legal duty. *Frederick v. Presque Isle Judge,* 439 Mich. 1, 15, 476 N.W.2d 142 (1991).

B. An order of superintending control has traditionally been used only to determine: (1) if the inferior tribunal has jurisdiction; (2) whether the inferior tribunal exceeded that jurisdiction; and (3) whether the inferior court proceeded according to law. *In re People v. Burton,* 429 Mich. 133, 139, 413 N.W.2d 413 (1987) (*citing Genesee Prosecutor v. Genesee Circuit Judge,* 386 Mich. 672, 681, 194 N.W.2d 693 (1972).

C. The process of seeking an order of superintending control is not an appeal. The review in such a case is limited only to questions of law. *In re People v. Burton,* 429 Mich 133, 139; 413 NW2d 413 (1987). A reviewing court cannot substitute its judgment of the facts if there is any competent testimony in the record to support the findings made below. *Bay Trust Co v. Dow Chemical Co,* 326 Mich 62, 65; 39 NW2d 244 (1949).

D. But by not complying with its own hearing and notice requirements, the City has denied Schanz notice and an opportunity to be heard at the administrative hearings preceding the state court action. The City has denied Schanz the ability to challenge the demolition through administrative remedies and to place his evidence in the administrative

record which the state district court will review when ruling on the petition for superintending control.

E. Also, by denying Schanz the ability to exhaust his administrative remedies and present evidence in those proceedings, the City has foreclosed Schanz from contesting the findings and order of the hearing board and the City Commission. A claimant has no cause of action to halt condemnation of buildings violating the building code unless administrative remedies have all been exhausted. *Euge v. Trantina*, 298 F. Supp. 873, 875-876 (E.D. Mo. 1969), *judgment aff'd*, 422 F.2d 1070 (8th Cir. 1970). "[W]hen a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Univ. of Tenn. v. Elliott,* 478 U.S. 788, 799, (1986).

F. If given proper notice, at the administrative hearings Schanz would have presented expert testimony[1] that no condition of the school existed which warranted demolition, rather than simple repair and, that Schanz has repaired the conditions noted in Brandon Weber's police report. The

---

[1] The experts are a former building inspector for the City and the current supervisor of Allegan Township.

evidence would have included Schanz's testimony and photographs of
the repairs.

G. But because the lack the required administrative hearings, in violation of
due process, Schanz is unable to challenge the City's allegations in the
state court, federal jurisdiction of the issues and injunctive relief against
the state court proceeding are proper.  "Parties may litigate constitutional
deprivation claims in federal court regardless of whether they took
advantage of a State court or State administrative procedure."  *Patsy v.
Board of Regents of the State of Florida,* 457 U.S. 496, 102 S.Ct. 2557,
73 L.Ed.2d 172 (1982) *quoted in Crow v City of Springfield, Ohio*, 15
Fed Appx 219, 223 (6th Cir., 2001).

H. For the above reasons, any decision of the state district court will not
satisfy procedural due process which requires that any proceedings for
demolition of the school be compliant with local law and procedure,
which requires proper notice of the hearings and a valid means of
determining that the property in fact was a public nuisance.

57.     For the above reasons, any demolition of the school will be without
due process of law in violation of the 5th and 14th Amendments.

58.     On March 23, 2021, the City posted on the school a civil infraction
ticket charging Schanz with violating the International Property Maintenance Code

20

Section 10-111.  Ex. 7.  Along with the ticket was posted an orange notice stating that no occupancy was permitted.

59.     But the posting of the notice mandating no occupancy was premature according to the City Code which provides that, only after the owner appeals from the order of the City Commission and the state court affirms that order, shall such a "placard" be placed on the building stating "CONDEMNED AS UNFIT FOR HUMAN OCCUPANCY."  City Code Sec. 10-166.

60.     The Code further states that after a placard has been posted, the building

> shall be vacated within a reasonable time, as required by the building official. No owner or operator shall let to any person for human occupancy and no person shall occupy or permit anyone to occupy such dangerous building which has been placarded by the building official, after the date on which the building official has required such building to be vacated, until written approval is secured from, and such placard is removed by the building official. The building official shall remove such placard whenever the defects upon which the condemnation and placarding action was based have been eliminated.

Sec. 10-166.

61.     By prematurely posting the placard on the school, the City has deprived Schanz of the peaceful enjoyment of his property without due process of law and has taken his property without compensation, in violation of the 5th and 14th Amendments.  Since the posting, Schanz has either not dared to enter the school or has done so with great trepidation for fear of arrest or other consequences

from the City's police officers who have already shown the inclination to enter his

building in violation of the 4th Amendment.

## COUNT I – VIOLATION OF THE FAIR HOUSING ACT-AGAINST MITCHELL, RAYMAN, AND THE CITY

62.     Schanz realleges and incorporates by reference, as though fully set forth

here, each and every allegation set forth in the above paragraphs.

63.     The persons that Schanz sought to make residential tenants of the

school, the Muslim Pacific Islanders, are protected classes under the Fair Housing

Act 42 USCA 3604(b), because of their race, Pacific Islanders, their color, brown

their religion, Islam, and their national origin, the Marshall Islands.

64.     Schanz sought to aid and encourage the protected individuals in the

exercise or enjoyment of rights to equal services and conditions of housing under

42 U.S.C. § 3604.  Schanz sought to provide the individuals with housing near

their job site in Plainwell to alleviate the long commute from their housing in

Grand Rapids.

65.     The Defendants Mitchell and Rayman intentionally discriminated

against the Pacific Islanders by coercing, intimidating, threatening and or interfering

with Schanz's efforts to aid the Pacific Islanders in the enjoyment of their rights to

fair housing.  The Defendants' repeatedly and emphatically warned and threatened

Schanz that the towns' people would hang him or run him and the Pacific Islanders

out of town if he provided housing for them at the school.  The Defendants' threats made Schanz fear for his and his family's safety if he provided housing for the Pacific Islanders.  The Defendants' threats dissuaded Schanz from providing that housing at the school.

66.     In addition to the coercion, intimidation, threat, or interference manifested through the Defendants' verbal threats to Schanz, the Defendants coerced, intimidated, threatened, and interfered with Schanz by instructing Brandon Weber to enter the school without a warrant, by seeking to demolish the school, by failing to give Schanz proper notice of the administrative hearings so that he could not contest the demolition of the school.  The Defendants threatened, coerced, and intimidated Schanz on account of him having aided and encouraged the exercise of the Pacific Islanders' right to live in the neighborhood of their choice.   The Defendants threatened and intimidated Schanz and sought to demolish the school to prevent Schanz from providing housing for the Pacific Islanders.

67.     Through the doctrine of respondeat superior, the City is liable to Schanz for the illegal acts of Mitchell and Rayman.

68.     Mitchell had complete and final authority over the policies of the City's administration, including policies concerning fair housing, issuance of blight notices, building inspections, and civil infractions.  Mitchell was the highest-ranking City official and was an official whose edicts or acts may fairly be said to represent

official policy.  Therefore, the City is liable for the acts and omissions of Mitchell in violating the Fair Housing Act.

69.     The coercion, intimidation, threat, or interference of the Defendants caused Schanz economic loss through lost rental profits up to the present time.  To this day, the Pacific Islanders still cannot find housing near to their job site because of discrimination of the City's residents.  They continue to commute from Grand Rapids and Kalamazoo.

70.     The coercion, intimidation, threat, or interference of the Defendants caused Schanz severe emotional damages.

71.     Schanz is entitled to punitive damages against Defendants Mitchell and Rayman for their intentional coercion, intimidation, threat, or interference which they perpetrated with maliciously.

72.     By reason of the mentioned acts and omissions of Defendants Mitchell, Rayman, and the City, Schanz was required to retain counsel and institute and prosecute this action (and the state court action challenging demolition), and Plaintiffs request payment by Defendants of a reasonable sum as and for attorney's fees pursuant to 42 U.S.C.A. § 1983.

## COUNT II – VIOLATION OF 5TH AND 14TH AMENDMENT
## PROCEDURAL DUE PROCESS -
## AGAINST THE CITY COMMISSION, AARON MITCHELL,
## BRET REITKIRK, AND THE CITY

73.     Schanz realleges and incorporates by reference, as though fully set forth

here, each and every allegation set forth in the above paragraphs.

74.     As owner of the school, Schanz has a property interest protected by the

United States Constitution.

75.     The City has made its position clear: it seeks to demolish the school.

Without a timely temporary restraining order and preliminary injunction from this

Court, the City will deprive Schanz of his property interest by demolishing the

school.

76.      Without timely intervention by this Court, the City will deprive Schanz

of his property interest in the school without affording him timely and adequate

process under the law. The City either failed to hold the administrative hearings or

failed to give Schanz proper notice of any administrative hearings concerning the

school and the City failed to afford him an opportunity to be heard and present

evidence at those administrative hearings.

77.     Mitchell had the duty to appoint a hearing board of three City officers

to initially hear and decide the school should be demolished.  ReitKirk, the City's

building official, had the responsibility for providing notice of the hearing to Schanz.

Mitchell failed to appoint the board, or, if the board was appointed, ReitKirk failed

to provide adequate notice of the hearing to Schanz.

78.    After the decision of the board, the City Commission was supposed to conduct a hearing to review that decision. The City Commission was responsible for giving Schanz adequate notice of its hearing.  The City Commission failed to hold the hearing or failed to give Schanz adequate notice of the hearing.

79.    The malicious animus of Mitchell and Rayman was made expressly clear.  Defendant Rayman had told Schanz that, "We would rather demolish your school than have those people live there."

80.    The City Commission and Mitchell had complete and final authority over the policies of the City's administration, including policies concerning its hearings.  The City Council was the highest-ranking legislative body whose edicts or acts may fairly be said to represent official policy.  Therefore, the City is liable for the acts and omissions of the City Commission and Mitchell.

81.    As a direct and proximate cause of the mentioned policies, procedures, customs, and practices of the Defendants, Schanz suffered severe emotional distress.

82.    By reason of the mentioned acts and omissions of the Defendants, Schanz will be forced to incur economic damages, including lost rent, lost profit from sale of the school, and general damages, in an amount to be proved at trial.

83.    By reason of the mentioned acts and omissions of the Defendants, Schanz was required to retain counsel and institute and prosecute this action (and

the state court action challenging demolition), and Plaintiffs request payment by Defendants of a reasonable sum as and for attorney's fees pursuant to 42 U.S.C.A. § 1983.

## COUNT III – VIOLATION OF 5TH AND 14TH AMENDMENT, TAKING PROPERTY WITHOUT JUST COMPENSATION- AGAINST MITCHELL, RAYMAN, THE CITY COMMISSION, AND THE CITY

84.   Schanz realleges and incorporates by reference, as though fully set forth here, each and every allegation set forth in the above paragraphs.

85.   As owner of the school, Schanz has a property interest protected by the United States Constitution.

86.   The actions of Mitchell, Rayman and the City Commission served to threaten, intimidate, coerce Schanz and interfere with his property rights in the school.

87.    The actions of Mitchell, Rayman, Weber and the City Commission, were calculated to acquire the property of the school coercively and cost free, to demolish the property and thereby foreclose the tenancy of the Pacific Islanders, and those Defendants' measures were taken in retaliation for the Schanz's resistance to the uncompensated taking.

88.   Those Defendants plainly violated Schanz's Fifth Amendment right to be free of such coercion.

89.   In seeking to obtain demolition of the school, the Defendants have not

complied with local law and procedure, and that flawed procedure will make demolition a taking as contemplated by the 5th Amendment.

90.    If in the future the City is permitted to demolish the school, that destruction will constitute a complete taking of Schanz's property interest.

91.     Mitchell had complete and final authority over the policies of the City's administration.  The City Council was the highest-ranking legislative body whose edicts or acts may fairly be said to represent official policy.  Therefore, the City is liable for the acts and omissions of Mitchell and the City Commission.

92.    The Defendants have taken Schanz's property interest in the school without just compensation.  Schanz is entitled to just compensation for the taking. In the future, Schanz will be entitled to just compensation for the replacement value of the school, if the City demolishes it.

93.    As a direct and proximate cause of the mentioned policies, procedures, customs, and practices of the Defendants, Schanz suffered severe emotional distress.

94.    By reason of the mentioned acts and omissions of the Defendants, Schanz will be forced to incur economic damages, including lost rent, lost profit from sale of the school, and general damages, in an amount to be proved at trial. Ultimately, if the City demolishes the school, Schanz will suffer the loss of the replacement value of the school.

95.    By reason of the mentioned acts and omissions of the City, its building

official, and the City Commission, Schanz was required to retain counsel and institute and prosecute this action (and the state court action challenging demolition), and Plaintiffs request payment by Defendants of a reasonable sum as and for attorney's fees pursuant to 42 U.S.C.A. § 1983.

## COUNT IV – VIOLATION OF 4TH AND 14TH AMENDMENT, ILLEGAL SEARCH - AGAINST WEBER

96.    Schanz realleges and incorporates by reference, as though fully set forth here, each and every allegation set forth in the above paragraphs.

97.    As the owner of the school, Schanz has a legitimate privacy interest in the interior of the school building and the surrounding property.

98.    On July 14, 2020, and July 28, 2020, Brandon Weber entered the school without probable cause, without a search warrant, and without any circumstances justifying entry and search without a warrant.

99.    Weber's entry into the school on the above dates constitutes a search under the Fourth Amendment.

100.   When Weber entered the school on the above dates, he acted as an agent of the City and acted under color of law.

101.   Weber's entries into the school were unreasonable and illegal under the 4th and 14th Amendments.

102.   As a direct and proximate cause of the illegal searches by Weber, Schanz suffered severe emotional distress.

103.   By reason of the mentioned acts and omissions of the Weber, Schanz will be forced to incur economic damages, including lost rent, lost profit from sale of the school, and general damages, in an amount to be proved at trial.  Ultimately, if the City demolishes the school, Schanz will suffer the loss of the replacement value of the school.

104.   By reason of the mentioned acts and omissions of Weber, Schanz was required to retain counsel and institute and prosecute this action (and the state court action challenging demolition), and Plaintiffs request payment by Defendants of a reasonable sum as and for attorney's fees pursuant to 42 U.S.C.A. § 1983.

**The Complaint is continued on the next page.**

**RELIEF REQUESTED:**

WHEREFORE, Schanz requests judgment against Defendants, and each of them, for:

1. General and special damages, according to proof;

2. Punitive and exemplary damages against all Defendants sued in their individual capacities in an amount sufficient to deter and to make an example of each such individual Defendant;

3. Temporary restraining order, preliminary and permanent injunction prohibiting the City from demolishing the school or proceeding with any state court actions to obtain an order of compliance for demolition, until the City has complied with the requirements for administrative hearings and other provisions of its Dangerous Building ordinance, City Code Sec. 10-161 to 10-167;

4. Pre-judgment and post-judgment interest;

5. Attorney's fees and costs of suit; and

6. Such other and further relief as this honorable court deems just and proper.

Respectfully submitted,

By /s/ Robert L. Levi
Robert L. Levi
Robert L. Levi, P.C.
4125 Cumberland Court
Commerce Township, MI 48390
robert@robertlevilaw.com
248-366-4412
State of Michigan Bar No. 42598

Dated:  December 4, 2021